We'll hear argument this morning in case 1795-72, Flowers v. Mississippi. Ms. Johnson. Mr. Chief Justice, and may it please the Court, the only plausible interpretation of all of the evidence viewed cumulatively is that Doug Evans began jury selection in Flowers 6 with an unconstitutional end in mind to seat as few African-American jurors as he could. The numbers alone are striking. In the first four trials, Mr. Evans exercised 36 peremptory challenges, all of them against African-American jurors. In the sixth trial, he exercised five out of six of his challenges against African-American jurors. If we look at the numbers regarding his questioning, they are likewise stark. He asked of the struck African-American jurors an average of 29 questions. He asked of the seated white jurors an average of 1.1 questions. But these numbers do not stand alone. Mr. Evans was twice found to have discriminated on the basis of race in the exercise of his peremptory challenges against African-American defendants in trials of the same case against the same defendant. There is no one who has a record of discrimination, adjudicated discrimination, like that of Mr. Evans. The history of the case prior to this trial is very troubling, and you've summarized that, and it is cause for concern and is certainly relevant to the decision that ultimately has to be made in the case. But if we were, I'm not suggesting that this is the way it should be analyzed, this is not the way it should be analyzed, but if we were to disregard everything that happened before this trial, and we looked at the strikes of the black prospective jurors as we would in any other bats in the case, do you think you'd have much chance of winning? The evidence still is clear and convincing that Mr. Evans acted with discriminatory motivation in this case, even if we set aside his history and the reasons that he was unwilling to tell the truth in previous cases. If we look at the jurors in question, one by one, there are aspects that I think would cause any prosecutor anywhere to want to get that jury, that juror off the jury. There's a juror who said that she couldn't view the evidence objectively, she couldn't make a decision based just on the evidence. There's one who said that she, because of her acquaintance with members of the Flowers family, she would lean toward the defendant. Another one who admitted that she made a false statement on her juror questionnaire because she'd say anything to get off the jury. Do you think those are bats and claims that would likely succeed if this troubling history had not preceded this case? This Court has demanded a sensitive inquiry into all of the circumstances that prove racial discrimination, and again, even setting aside his history, there are many circumstances here that suggest racial motivation. First, as I already said, there is an extraordinary record of disparate questioning, and the disparate questioning is not limited to those numbers, but to the tone of his questioning. I believe that one of the responses that you quoted came from an extremely aggressive pursuit of an African-American juror who initially said she would not be troubled and ultimately said, it's possible. Now, of course, a prosecutor could take that approach with every juror. If he took that aggressive approach with every juror, then there would be nothing to complain about, but he did not take that approach with white jurors. And then there is his out-of-court investigation of three African-American jurors. And then there are... Well, what's wrong with that? Again, putting aside the reasons to be suspicious, if a juror says, I don't work closely with the defendant's sister, I don't work close to the defendant's sister, and the prosecutor has reason to suspect that's not true, is there something wrong with the prosecutor going to the human relations person at that place of employment and bringing that person in to testify they actually work nine to ten inches apart? Is there something wrong with that? There's nothing wrong with that if there was reason to disbelieve this juror. The juror volunteered that she knew her, that she worked in that place. Mr. Evans cited no reason that he should not believe her. But also, what happens after that is somewhat suspicious, which is he brings someone in to say, well, they worked very close together, and that someone says, and I could produce the evidence, and when asked to produce the evidence of that, the records that produce that, he doesn't come back with that evidence. So I think we could certainly... And a rich prosecutor might investigate all. Did he have that witness ready that same day? No, he brought the witness back the next day. What is your strongest strike? I think the clearest case is that of Carolyn Wright. About Carolyn Wright, he made three false statements. The first statement he made was that her wages were garnished. Well, actually, we have found that in the record, with a State exhibit on it, a judgment that shows that her wages were garnished. No, the wages, there's a mark that shows that there was such a request, but both the trial court and the Mississippi Supreme Court looked at that record and found that her wages had not been garnished. Well, we can look at that, we can look at the judgment, but the fact remains that she was, this was, one of the victims was the proprietor of a family-owned store, right? That's a family-owned store. And the store sued her? Well, the store sued her. The victim herself had not sued her. Oh, but the store did. But normally, wouldn't that, you know, again, put aside the history, but we can't, in the end, we can't do it. But if you did, don't you think a prosecutor or any attorney would be very wary of having a juror who had been sued by one of the parties? I think that if this prosecutor had pursued bias with respect to white jurors, as well as African-American jurors, and then made that strike, then that would be a strike that would be a permissible strike. But in fact, he didn't do that. So first of all, I do want to notice that this was one of four victims. It does seem rather unlike that a person in a quadruple homicide case would be biased by a subsequent suit of one of the relatives. But even if we thought that that were true, one would have imagined that the prosecutor would have inquired about bias with respect to the other victims. Wasn't there a question asked of the entire array of whether they had any debts to the store? Yes, but there was no question asked about suits or disputes with the other three victims. Nor was there an inquiry into bias that I think any rational prosecutor would have made, if concerned truly about bias, which was lawsuits, prosecutions of the jurors and their close relatives by his office. The prosecutor made no inquiry about that. If you were worried about bias, you would be worried about that. Did he even ask Ms. Wright how she felt about that suit and whether it would affect her in this case? In fact, she was asked about the suit, and when she was asked about that suit, what she said is that she had paid the debt and that she had no ill will toward the Tardys. And indeed, if we follow up on this reason, I think this reason is especially suspicious because he cited the same reason with respect to Edith Burnside. So, first of all, he cited, with respect to Edith Burnside, he repeated the false statement that her wages had been garnished, despite the fact of having been called by the trial court on it the first time, and then he said that he was striking her in part on that basis. But Ms. Burnside... Can you go back and just slow down a second? You said to Justice Alito that that record in... that state record that says something about garnishment, that the state courts found that that was not adequate. Could you explain why not? Well... That judgment in the record, what is it? Or... The judgment... It's not a... It's a form in the record, but what does it mean? The form in the record reflects a suit, and there's a little check by garnishment, but if you look at the order at the end, there is no garnishment order. The trial court looked at that, and the Mississippi Supreme Court looked at that, and I think they are the experts about what their documents mean, and they said there was no garnishment. What if it turned out there were a garnishment? How would that affect your argument, if at all? Well, then that would mean that he only made two false statements about juror right. The two false statements were that she knew Flower's sister Cora, and that she knew Flower's sister Sherita. So, then there would be two. But if I could go back for a moment to Ms. Burnside, when he repeated this the pretext of this reason is apparent when we look at Ms. Burnside. Ms. Burnside worked for Ms. Tardy. Ms. Burnside worked for Ms. Tardy, caring for her mother. Ms. Burnside was helped during her divorce by Ms. Tardy. So, whatever she might have felt negative about the son-in-law, the feeling she would have had about the victim herself could only have been positive. And yet he cited the same reason. When we look at that, what we see... Didn't Juror Burnside also say repeatedly she didn't want to judge anybody? No, she did not. Oh, Juror Burnside said that she did not want to judge anyone. She did say that. But I think... You think that's not a legitimate reason for striking a juror who's going to have to judge whether someone who's accused of a serious crime is guilty or not? That is a legitimate reason for striking a judge. I'm sorry, for striking a juror. But the problem isn't whether the reason is a legitimate reason, but whether the reason was pretext. And when we look at what he did with respect to citing the relationship, having been sued by the Tardys, it looks like everything he's saying is pretext. And if I could also go back to the rest of your question about juror right, so there were three misrepresentations with respect to juror right. They also cited the number of defence witnesses that she knew, but the prosecutor, Doug Evans, did not question prospective white jurors Waller, Lester, Blaylock and Fields about their relationships with defence witnesses, nor did he strike them when he had an opportunity to do so. But isn't it true she also worked with the defendant's father? She worked in the same location as the defendant's father. She worked in the same store. She worked in the same store. The world's smallest Walmart. That's what the trial court described it as. But it is important to notice that when she was asked, does he still work there? She didn't even know if he still worked there. So there's really... But did she still work there? She did. I thought she had left. No, that's another juror with respect to... I believe with respect to Cora Flowers. But what I wanted to... She didn't know if he still worked there. Compare her with Pamela Chastain, though that comparison is the one that I'm most interested in. I was about to do that. And so I think that it's true that working with someone under some circumstances might produce bias. It is interesting that the only thing she said that might suggest the closeness of the relationship is that she didn't know whether he still worked. And Evans did not ask about the closeness of the relationship, nor did he worry about the closeness of the relationship with Juror Chastain and four, or I think it's maybe even five of Flowers' family members. Juror Chastain worked as a teller in a bank where all five of them came. And she... Yes, she knew the father and the mother and two sisters and a brother. And Doug Evans was not interested in... Isn't that relationship of a bank teller to someone who comes to make a deposit different from someone who is a co-worker and it would encounter someone in the work setting on a daily basis? It is a different relationship or it could be a very different relationship. We can't actually even know the closeness of either relationship unless there was inquiry. But Doug Evans did not make that kind of inquiry. Indeed, what he said to Juror Chastain is, and that was a purely professional relationship. He didn't ask whether she had a close relationship, whether she was worried. He instead presumed, reassured everyone that she did not. All the questions that we've been addressing here are the same sort of questions you would get in a typical Batson case, looking at the circumstances of the potential jurors that were struck in this case. But I mean, of course, as my colleagues have recognized, the case is unusual because you have the extensive history. And I think that's probably why the case is here for review. And I'm interested because obviously the rule we adopt will apply in other cases. How far your argument that we need to look at the past history is pertinent. If the prosecutor had one Batson violation in his 30-year career 20 years ago, is that something that should be brought out and pertinent in the assessment of the current Batson challenges? Mr. Chief Justice, may I say one thing about Carolyn Wright that I don't want to forget? Sure. The other thing that's noteworthy about her is that she put on her death penalty questionnaire that she was strongly in favor of the death penalty. So when we look at her as a whole, a prosecutor who was looking in a colorblind way would have been attracted to her. Now for my question. Now for your question. And I apologize, but I was worried I would not get back to that. So I think this is an extraordinary case. I have combed the cases and I cannot find any case. I know, you're fighting the hypothetical. My question is 30 years, Batson violation 20 years ago, is that pertinent to the consideration in the current case? I'm sorry, I didn't understand the question then. Yes, it is pertinent, but it's weakly probative. So I think when we conduct a consensitive inquiry, we look as we would in a criminal case. We look at how recent a fabrication has been, whether it's on a relatively similar matter, whether the person has the same motive. So a case that occurred 30 years ago would be very different in terms of motive. It also would be quite different in terms of the established law of this court. So someone who violates Batson before it's announced or someone who violates Batson immediately thereafter, that's less probative than someone who has done so repeatedly. So what is the rule you would have us adopt as a general rule? Not just in a particular case as extreme as this one. The general rule is a rule that you have already adopted, which is that in stage three, every factor that bears upon credibility is relevant. So that's the general rule. And I suppose if we say that in another way, the Mississippi Supreme Court asked only the question of, is there a reason for this juror left standing that is not contradicted by the record and exactly matched by a white juror? And that's not the right rule. The right rule is a sensitive inquiry. Your turn. No, you go first. All right, Justice Gorsuch. I wanna pursue the Chief Justice's question just a little bit further so I can understand what you'd have us do in the next case. Let's just suppose this case, trial six, was perfect and the strikes were without taint otherwise. But we have this history with this prosecutor. Would that be a problem still or would there be no Batson violation in those circumstances? If there weren't eight misrepresentations of fact, disparate questioning, all that stuff. Right, you're finding the hypothetical again. Yeah, yeah. The hypothetical is, let's suppose that this case, there were strikes, but they were explained by non-discriminatory reasons. And there were no other. Yet we have this prosecutor with this history. What then? How should the court assess a case like that? If there are no other indicia of discrimination, then the defendant has not met his burden of proof by proving prior discrimination. Okay, so we need discrimination in this trial in order to have a Batson violation. Yes. Okay, all right. That's helpful, thank you. My question was about the history. I thought that Swain had said that the history was relevant. In fact, Swain said history was the only way you could prove a violation. What Batson did was to say, no, you can look even at the individual case. But Batson, as I read it, did not say you no longer take account of the history. Your reading of Swain and how Swain and Batson interact? I think that's entirely correct, Your Honor. Even in Swain, history was relevant. And to look more broadly, in Arlington Heights, this court said that history is relevant. So, and in Millerell, said that history was relevant. So there isn't a new rule about history being relevant. The Mississippi Supreme Court ignored what this court has already said about history being relevant. And the broader point that everything- The court said it took account of the history. So what are we to make of that? Well, if the court had taken account of the history, it couldn't have come to this conclusion. And I think there's many reasons in the opinion to believe that they did not. They said, considering the history, it doesn't alter our opinion. And they pasted in their prior opinion that was history blind. They also said, his history does not undermine his stated reasons. That's wrong. It undermines those reasons. It may or may not be sufficient. But a history of a desire for an all-white juror, a history of willingness to violate the Constitution, and a history of willingness to make false statements to a trial court, those things in the past, with respect to at least three other jurors, that does undermine it. And then I think when we look at what they actually did, there is no point in which they say, yes, we are more skeptical of the reasons that he stated because he was dishonest before. Or yes, when I look at the false statements he made here, the eight false statements he made here, those match with false statements that he made before. They never did that. So I think they did not consider his history, nor did they consider anything else that would be consistent with this court's insistence that we look at the totality of the circumstances and conduct a substantive inquiry. Ms. Johnson, your strongest case is a potential juror of right. One of your complaints is that there were many more questions asked of African-American potential jurors, but that wasn't so in Wright's case. She was asked, I think, only three questions. That's correct. But I think it is actually the relevance of the disparate questioning is not merely to ask how many questions this juror was asked. So it might indeed be, as the Mississippi Supreme Court said, that with respect to some African-American jurors,  because more of them knew Flowers' family. But the point still remains, and this is the point that this court made in Miller-El, disparate questioning of even another juror is relevant. It does suggest that the prosecutor is looking for reasons to strike an African-American juror as opposed to being interested in bias or death penalty attitudes or anything else. Ms. Johnson, some time ago, Justice Alito asked you about the prosecutor's investigation of certain potential jurors. And how many jurors did the prosecutor separately investigate? Three. And all African-American? All of them were African-American. And when defense counsel said, he's investigating African-American jurors, there's no evidence that he investigated anyone else, he said nothing. So he had an opportunity to say, oh, I've investigated everyone, and he did not say that. And can I ask you about the disparate questioning? Because you referred to something which struck me as I read through all of this. This is, unlike some Batson cases you see, it's a very small town where everybody knows everybody, apparently, or many people know many people. And it's a largely segregated town where you might think that African-Americans knew more African-Americans than they would whites or vice versa. So does that account for some of the differential questioning? In other words, just sort of looking at the environment and saying, I have to push more on whether X knew Y because given the circumstances of the town, X might very well have known Y. The Mississippi Supreme Court said that it accounted for some of the differential questioning, and I think that's correct. There are more African-American jurors who report relationships with defense witnesses or the defense family members. But there are five white jurors who report such relationships and whom the prosecutor did not ask questions about those relationships. So- When you said such relationships, were they relationships because of working at the same place or living in the same neighborhood in the case of the white jurors? They were, none of the relationships were working at the same place. But when he was asked, when they were asked in group, voir dire, about whom they knew, white jurors responded that they knew defense witnesses. And they were not questioned about those witnesses. So we can't really know what the nature of those relationships are if we don't ask questions. Do you have those names, or is that in your brief someplace? It is in the brief, but it is Waller, Lester, Blaylock, and Fields, as well as Chasteen. I found it strange, but maybe you can, or unusual, I should say, not strange, unusual, that there were some white jurors who had people accused of crimes in jail, relatives accused of crimes in jails. Were there any questions about how that affected those white jurors? No, there were no questions about that at all, of three of them, and I think a very brief question for two of them. And I think that goes to the question of, was he really investigating bias when he asked this question about being sued by Tardy Furniture? If you're really investigating bias, you would be concerned about bias against your office, and he was not interested in that. So, with the court's permission, I will reserve the rest of my time for rebuttal. Thank you, counsel. Mr. Chief Justice, and may it please the court. The history in this case is troubling, but the history is confined to this case, and as Mr. Chief Justice pointed out, it is unusual. This is the sixth trial in this small town, a small town of approximately 5,000 individuals. The questioning of whether the makeup or the limited number of individuals in the town was one of the reasons for follow-up questions is accurate. At the outset, let me say that the Mississippi Supreme Court's decision in this case was commensurate with Batson and its progeny. And I would return to Justice Gorsuch's question of, if we disengage this troubling history, and I agree, I'm not suggesting that, as Justice Alito said, however, if we take that out of the case, we don't have any taints. Could I just ask you a question of Mississippi law? Could the Attorney General have said, enough already, we're gonna send one of our own people to try this case, preferably in a different county where so many people don't know so many other people? Could he have done that? Statutorily, the Attorney General's office is allowed to assist, is allowed to take over, but only upon request by that district attorney. So that was not an option in this case. We were not so requested. You said if we take the history out of the case. We can't take the history out of the case. Oh, no, Justice Kavanaugh, I'm not saying that. That's what I was saying, exactly. 42, 42 potential African Americans and 41 are stricken. Right? Yes, Your Honor, that is correct. We have to, that's relevant, correct? That is relevant, yes, Your Honor. The, as this court has held in Miller et al, history is part of the consideration. So you agree that it's not only the adjudicated backs and violations that are relevant, but also the number of strikes, such as Justice Kavanaugh listed? I do, with qualification. There, the strikes were unique. The strikes in this case are supported in the record. Each of the jurors that were struck either worked with a relative, were related, or knew intimately family members, the defendant or his family members, up to and including one juror who lied on her questionnaire and then admitted to lying on the stand. You have a very strange position on potential jurors who lied because there was the case of white juror Huggins who said he had no knowledge of the Flowers case when, in fact, he was on a 2007 Wadeer panel. And you say, oh, well, that doesn't matter that he lied because he didn't admit to lying. I think if someone lied and didn't admit to it, that would be a count against that person rather than in that person's favor. And the trial court in this case made the distinction that the juror who was struck for lying on her questionnaire admitted on the stand that she lied intentionally, which was not the case with juror Huggins. And it would seem and appear that his participation in the panel, and he was dismissed long before he got anywhere near selection, that he either forgot that or completely left his mind at the time he was initially questioned. But let's go back to that. If we're looking at whether this is pretext, Mr. Evans was willing to give an excuse to this juror and keep him despite the fact that there was direct evidence that he knew about the case. He was willing to accept the white lie, but not a truthful answer under oath in front of a judge. Doesn't that suggest pretext to you? Again, Justice Sotomayor, the issue, as it reads from the record, is that the juror who lied on her questionnaire expressly admitted that she lied for the sole purpose of getting off the jury. Well, I have to tell you, if that were the case, I don't think one could take one juror and not push them on those questionnaires and come up to an intentional understatement or overstatement. Again, Your Honor, and this is one of the issues with this case, is that each one of these strikes that we have, we don't have one single reason. We have, let's look at them. But you do have history. Trial one, five black juror possibles, uses peremptories, strikes all five. Trial two, five jack jurors possible, uses all five, strikes all five blacks, okay? Trial number three, there were 17 black possible. He uses only 15 this time, why? Because he ran out of peremptories, so he only had 15. All right, fourth trial, 16 black, he only struck 11. That's because he only had 11 peremptories perhaps, all right? Now we come to this trial with that background, okay? And I don't think it's gonna take much once you have that background. So now let's look at one black juror, one white one, potential, okay? Let's call them one and two. Both are women. Both are in their mid-40s. Both have some college education. Both strongly favor the death penalty. Now, the potential black actually has a brother serving as a prison guard. Now you would have thought that might have favored the prosecution in the prosecutor's mind, okay? So that's one difference. I don't think that cuts in your favor. Then, have they ever had anybody arrested, you know? No, neither has. And do they know people in the case? Yeah, they each know something over 30 people. Same, same, same, same. Now, is there a connection with the Flowers family? Well, the black juror did in fact possibly work at some distance, we don't know quite what, with the father at Walmart. And the white one knew his father, mother, sister, cousin, through her work as a bank killer. And then we get the last thing, which the Mississippi Supreme Court thought was so crucial, is that the black potential juror was sued for overdue credit. And maybe she paid the garnishment of $30, I don't know. But the white juror had been a friend of the victim's daughter in high school, okay? There we have potential black, potential white. And we have the whole background. Looking at that, you tell me, what was the difference as to why he could strike if that background, Carolyn Wright, the potential African-American juror who was number four, and Pamela Chesterton, the potential white American juror who was number 17? What's the difference? What's the difference given all those similarities? Juror 14, Carolyn Wright, was struck because she was sued by Tardy. Yeah. Juror 14, Carolyn Wright, worked with the defendant's daughter, Archie, at Walmart. Yep. The distinction would be- Wait, wait, you didn't add that juror number 17 had been a friend of the victim's daughter in high school and also knew Flower's father, mother, sister, and a cousin through her work as a teller at the bank. Wright's relationship with the father was a work relationship, an employee-employee relationship. Chesterton was a bank teller, admitted that she just saw them coming in through the bank. So this was an employee and customer relationship which the Mississippi Supreme Court made a distinction. In other words, it was closer, the first relationship. Well- And the record when I read that will bear out that the first one really was a closer relation than seeing them every week or whatever as a bank teller. The record- Will it say that? I don't think it will because I think they said, well, how closely physically did you work with the father? And there was no answer to that question. The record will bear out that the district attorney only struck those individuals that worked with members of his family and that was consistent. Okay, so that's the reason. The distinction is when I go back in the record, I have to say, knowing Flower's father, mother, sister, cousin through the work as a bank teller is not a good reason for striking somebody. But working with Flower's father at some unknown distance at Walmart is. And that's the crucial difference I will find. There is a difference there, but is there anything else? Because after all, I have the history, plus now I've narrowed it down. That's why I asked. I've narrowed it down to that being the difference. Again, Justice Breyer, I would also say that one of the differing things was that she was sued by Tardy. Yes. Which was a theme of at least one other. And so I also should look at that and then decide whether that really is more significant than the fact that number 17 was friends with the victim's daughter in high school. You know, sometimes you're friends with your high school, high school pals you don't forget. So those are the two things I should look at. Is there anything else? I think that's enough, Your Honor. Well, I do too. In many respects, Mr. Davis, Ms. Wright is a perfect juror for a prosecutor, right? She strongly favors the death penalty. Her uncle is a prison security guard. Her relative is the victim of a violent crime. Except for her race, you would think that this is a juror that a prosecutor would love when she walks in the door, isn't she? Not if she works with the defendant's family and not if she was sued by the workplace of one of the victims. And that's the distinguishing factor here. Counsel, I don't want to imply, I'm sorry, you have directed me to the two relevant parts of the record. And before I make up my mind definitely, I will read those two relevant parts, both sides. Okay? Counsel, again, we're sort of conducting this as if it were one case. And in terms of a broader rule, do you recognize or do we recognize in our precedent any restriction on the prior history that can be brought up with respect to a current case? No, Your Honor. And far be it for me to presume the full basis for the grant, but I certainly see that as one of the issues before the court is, as Your Honor asked, how far are we to go? And what does it matter? What part does that history play? My point is, is there anything in our precedent that suggests that there ought to be a limitation on looking to the history of the prosecutor involved? There's no limitation on the history. I think certainly the precedent says that you have to consider it. I'm not aware of any language in Batson and its progeny for this particular circumstance where we have six trials by the same district attorney. I'm not aware of any. This is a unique situation in that regard. And along those lines, Justice Breyer's pointed out a dichotomy that in other circumstances might be explicable by an innocent reason. But if all of the history is relevant, as you acknowledged, what light does that shed on what otherwise might appear to be an innocent strike? And when should, what rule would you lay down? I know that's hard to do, but we're presumably taking cases to guide future disputes, not just resolve this one. How would you write that rule as to the relevance of the past information when we're looking at the current trial? In responding to that, Your Honor, let me say that when we use the word history, we are limiting it to this case. This district attorney in his over 25 years of experience having searched for additional cases and no case is cited by the petitioner outside of this case in regards to a Batson violation. So the history is limited here. The question then is, what to do in a case like this? How much does the specter of those two prior violations come into play in the analysis in this? I think it certainly has to be looked at. I believe the trial judge- Is it just the specter of the two violations? Weren't there two cases that were overturned or in which prosecutorial misconduct, at least the first, was overturned on prosecutorial misconduct? They didn't even reach the Batson challenge. Yes, Your Honor. But doesn't that tell you something about this man's passion for this case? I don't even need to call it anything else, but doesn't that tell you how you should be looking at this case? I can't speak to his passion for the case, Your Honor. I can speak to his pursuit of conviction in this in the sense of the six trials in which they were- I understand he didn't ask the attorney general to step in, which he could have, to prosecute the case. But I understand he lobbied two legislators to try to change the venue legislatively. Is that correct? That's my understanding, Your Honor. So he could try the case? Well, try the case outside of Montgomery County. Instead of getting the attorney general to try the case. And I would again reiterate- In his own county. Yes, Your Honor, and we are strictly prohibited from interjecting ourselves in cases we tried, not in this case, but in another case in our Supreme Court. In Batson- We knew that. Sorry. In Batson, we held that a prosecutor cannot state merely that he challenged jurors in the defendant's case, of the defendant's race, on the assumption or his intuitive judgment that they would be partial to the defendant because of their shared race. That was really the critical sentence in Batson, and the dissent disagreed with that, the critical change. You can't just assume that someone's gonna be favorable to someone because they share the same race. And when you look at the 41 out of 42, how do you look at that and not come away with thinking what was going on there was what the dissent in Batson said was permissible, but the majority said was not permissible, that there's a stereotype that you're just going to favor someone because they're of the same race as the defendant. I respectfully, in this case, in no way agree that there was some prior determination made by the district attorney that because of this person's race, they were not gonna be favorable. Again, this case has spanned some 23 years now in this small community. One of the inherent problems- I guess I don't understand how you can say this. In this case, there were three adjudicated Batson violations. Two. Okay, two. Two. The Flowers Three and Flowers Two both had adjudicated Batson issues. That the trial court was aware of that was evident. The same trial judge presided over the fifth trial. And in this case, we had the same defense counsel. Counsel moved in motions that were offered in the fifth trial up to and including in joint appendix 42, motion number 57, which was a motion to bar prosecution from exercising peremptory strikes at all, or at least from exercising them against non-white venari members. Judge Loper adopted his prior rulings. His ruling on that motion also included caution. Caution to both parties that if there's any objections or challenges based on demeanor or based on a juror's appearance, that if it wasn't in the record, he was not going to consider it. I'm sorry, counsel, did you just- Can we have some- Can we say if this- I'm sorry. Go ahead. Justice Sotomayor. Did you just say that the same judge who tried the fifth trial also tried this sixth trial? Yes, Your Honor. And wasn't he the judge that ordered Mr. Evans to prosecute the sole holdout juror in the fifth trial? And didn't Mr. Evans do that? And the attorney general take over the case and say there was no basis for that prosecution? There were two jurors that were bound over to the grand jury on the basis of perjury. One pleaded guilty to that, and the other was null prosed. Again, and that was handled by the attorney general's office not my division, but another. But I think the attorney general null prosed because there was no basis for that prosecution. I don't know that there was not a basis, I just know that it was null prosed. May I ask you about- Could you say in this case, because of the unusual and really disturbing history, this case just could not have been tried this sixth time by the same prosecutor? That you just cannot, in light of the history, you just can't untangle what happened before from the particular strikes in this case. But again, your honor, hindsight's 20-20. I was not involved in any consideration on that. Had I been, it might have been a suggestion of mine that that be the case, but that wasn't. And however, the record in this case by no means supports the conclusion that the Mississippi Supreme Court's decision ran afoul of Batson or its progeny. And if I may, I'd like to return to what I was saying about the trial judges being aware of the history. Specifically, Judge Loper said at the transcript at page 314, I know what Flowers III said. He then cautioned the state, I'm going to look very closely at this case. Again, the judge acknowledging that he would be diligent in making sure the same type of error did not occur again. How closely did he look? I mean, let's talk just about the questioning in this case. The numbers themselves are staggering, the number of questions that were asked to African Americans versus whites. But more than the numbers, if you look at the way what these questions were targeted to do, let's take for example the questions on the death penalty. This prosecutor would question a white person who said that he or she had reservations about the death penalty. And the questions are all designed to rehabilitate the person. You know, the prosecutor would say, well, if the law required you to do it, you could follow the law, couldn't you? And then the person would say yes. But if an African American said that he or she had qualms about the death penalty, the prosecutor would say the exact opposite. The prosecutor would say something like, well, it would be really hard for you to apply the death penalty then, wouldn't it? So in every case, this kind of disparate questioning, you know, it looks as though he's designing, he's trying to create a record for striking black jurors that will, and for distinguishing black jurors from white jurors by means of his questioning, which is sort of, you know, completely opposite from the questioning that he gives to whites. I think the questions that the district attorney asked were a direct result of those responses these particular jurors provided in General Vauder. And- Well, I think what I'm saying is it's not. Two jurors, one white, one black, says I have reservations about the death penalty. And he says to the white one, but you could follow the law. And he says to the black one, well, I don't know. I guess you can't follow the law. Respectfully, Your Honor, that's not the case as I read the record. The, each juror that indicated they were against the death penalty is certainly one that in a general context that a prosecutor would not want to be on the jury. And of course, we had in this case, vacillation amongst these jurors. For example, Flancy Jones, who on her juror questionnaire said she was strongly against the death penalty, and then during questioning said she could consider it, but then went on to admit that she lied on her juror questionnaire. So the questions that the district attorney asked were to follow up on what was on the juror questionnaire with regard to their statements therein regarding the death penalty. In this case, the record itself shows that the district attorney offered valid race-neutral reasons for each strike. Each strike was considered by the trial court who had made the parties aware of, that he was aware of the history of the case. And the record supports that all the jurors that were struck were struck because they were either sued by Tardy Furniture, they were either related to the defendant or friends with, or had worked with members of the defendant's family. And these are all valid race-neutral reasons. But there were no questions of white jurors who said they had a relationship with defense witnesses. There were no follow-up questions for them. They just said yes, they knew defense witnesses. The only, to my recollection, Justice Ginsburg, is Pamela Chastain who indicated that she knew Flowers' family, but only because she was a bank teller and she'd seen them come in. Again, that was a general question. We don't know what the relationship of the others were because they weren't asked. They said they had a relationship with defense witnesses, but they weren't asked what is the relationship. I'm sorry, I misunderstood. Regarding the ones that said they knew these witnesses in the case, Your Honor, yes. And the Mississippi Supreme Court noted that, that there were, and again, this is part and parcel of the issue with this unique case, is that 5,000 people in the town, everybody knows everybody, and everybody knew everything about the case. And the Mississippi Supreme Court noted that these witnesses on both sides knew numerous witnesses for both the prosecution and the defense. And that is, of course, but one part of the analysis. You have to look at the reasons that were offered by the district attorney. And in this case, they all support the strikes that were made. Part of Batson was about confidence of the community and the fairness of the criminal justice system, right? Yes, Your Honor. And that was against a backdrop of a lot of decades of all-white juries convicting black defendants. Swain said, let's put a stop to that, but really didn't give the tools for eradicating discrimination. So you had another 21 years of that until Batson. And then Batson said, we're gonna give you the tools to eradicate that, not just for the fairness to the defendant and to the juror, but the community has confidence in the fairness of the system. And can you say, as you sit here today, confidently you have confidence in how this all transpired in this case? I have confidence in this record, Justice Kavanaugh. I have confidence in the strikes that this district attorney made based on the four corners of this record. I have confidence that if reviewed with an eye towards what actually transpired, it supports the Mississippi Supreme Court's decision in this case. That I have confidence in. Thank you. In how this case was prosecuted? Based on this record, yes, Your Honor, I do. You know, one of the first things I did when I found this case was to try to do some research, because at least my former state prosecutor's office would have substituted attorneys long before the FISC six trial. Regrettably, I wasn't able to find any formalized guidance on that, but it does seem odd to me. That any prosecutor would continue to try a case with this history. And again, I would agree completely, Justice Sotomayor, that we have an unusual circumstance, an unusual case with these six trials having been all tried by the same prosecutor. But I would resubmit, again, that the decision of the Mississippi Supreme Court in this instance was not violative of Batson and its progeny. Thank you, Mr. Chief Justice. Thank you, counsel. You have four minutes remaining. Ms. Johnson? Unless this court has further questions, I will waive rebuttal. Ms. Johnson, would you kind enough to tell me whether or not you exercised any peremptories? I was not the trial lawyer. Well, did your word, any peremptories exercised by the defendant? They were. And what was the race of the jurors struck there? She only exercised peremptories against white jurors. But I would add that her motivation is not the question here. The question is the motivation of Doug Evans. She didn't have any black jurors to exercise peremptories against, except the first one. Except the first one. But so did the prosecutor except that one. Correct. After that, every black juror that was available on the panel was struck. Yes, he struck one. He seated one African-American juror, and at the very end, struck one white juror. When all of the evidence in this case is considered, just as in Foster versus Chapman, the conclusion that race was a substantial part of Evans' motivation is inescapable, and the Mississippi Supreme Court's conclusion to the contrary is clearly erroneous. Thank you, counsel. The case is submitted.